**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| SUSAN LORENZI, | ) | |
|           Plaintiff, | ) | |
| vs. | ) | 3:11-cv-00342-RCJ-WGC |
| PRUDENTIAL INSURANCE Co. OF AMERICA, | ) | **ORDER** |
|           Defendant. | ) | |

This case arises out of an alleged underpayment of life insurance benefits. Defendant has moved for summary judgment. For the reasons given herein, the Court denies the motion.

**I.      FACTS AND PROCEDURAL HISTORY**

Plaintiff Susan Lorenzi is a Nevada citizen and an employee of non-party Microsoft, Inc. (*See* Compl. ¶¶ 3–4, 7, Apr. 18, 2011, ECF No. 1-2). In March 2009, Microsoft offered Plaintiff group life insurance with Defendant Prudential Insurance Company of America ("Prudential") under policy number G-43994 (the "Policy"). (*Id.* ¶¶ 5, 8). The Policy is between Prudential and Microsoft, with Plaintiff as a third-party beneficiary. (*Id.* 5:5–6). The Policy does not provide for employer contributions, and Microsoft has never made any contributions to the Policy's premiums, thereby exempting the Policy from ERISA coverage pursuant to 29 U.S.C. § 1321(a)(5). (*Id.* ¶¶ 6, 21). Under the Policy, Plaintiff could elect to insure the life of her

1  husband, Rodney A. Lorenzi, for 20% to 50% of the amount her own life was insured; in
2  Plaintiff's case, this came to between $89,000 and $223,000 of coverage for her husband. (*See*
3  *id.* ¶ 9). Plaintiff chose to insure her husband's life for the maximum possible amount of
4  $223,000 ("full coverage"), with Plaintiff as the beneficiary. (*Id.* ¶¶ 9, 13). However, Microsoft
5  initially only deducted premiums from Plaintiff's paychecks as if she had chosen to insure Mr.
6  Lorenzi for $89,000 ("partial coverage"), and Prudential therefore only insured his life for that
7  amount. (*See id.* ¶¶ 9–11).
8        Shortly after entering into the Policy, Plaintiff received an email message from Defendant
9  concerning an "Evidence of Insurability" ("EOI") form, but she ignored the email because it was
10 marked as "low priority" by her email program. (*See id.* ¶ 12). Mr. Lorenzi died unexpectedly
11 on May 1, 2009. (*Id.* ¶ 14). On May 6, 2009, Plaintiff received a second email from
12 Prudential—who was apparently not yet aware of Mr. Lorenzi's death—indicating that
13 Prudential needed more information about Mr. Lorenzi before it would extend full coverage.
14 (*See id.* ¶ 15).[1] Plaintiff initially ignored this email, as well, because it was marked as "low
15 priority" by her email program, but she eventually reviewed it on June 1, 2009. (*See id.* ¶¶ 16,
16 18). The second email contained Defendant's request that she complete an EOI form for her
17 husband. (*Id.* ¶ 18). Possibly after receiving the email ("at about the same time"), Plaintiff had
18 submitted her husband's death certificate to Defendant. (*See id.* ¶ 17). Plaintiff filled out the
19 EOI and returned it by fax on June 4, 2009, signing it as "surviving spouse." (*Id.* ¶ 19).
20 Beginning in May (2009? 2010?), Microsoft began deducting full coverage premiums from
21 Plaintiff's paychecks, retroactive to the date Plaintiff entered into the Policy, and continued to
22
23
24     [1]It can be fairly inferred that the first email was of the same nature and that Prudential had automatically caused Microsoft to deduct premiums from Plaintiff's paychecks only for partial coverage because it had not yet agreed to extend full coverage and would not do so until it
25 received an EOI form on Mr. Lorenzi.

1  deduct full premiums until June 30, 2010. (*See id.* ¶ 20).[2] Defendant accepted these premium
2  payments. (*Id.* ¶ 22).

3  On July 17, 2009, Defendant informed Plaintiff that it had denied her claim in part. (*Id.*
4  ¶ 30).  Defendant paid Plaintiff only $89,000, explaining that an EOI form had to be completed
5  before an insured died in order for Defendant to extend full coverage. (*Id.* ¶ 31).  Plaintiff notes
6  that the second email indicated the EOI form for her husband was not due until June 6, 2009, but
7  this was likely based on Defendant's assumption that the insured was still alive, as Plaintiff notes
8  that she may have sent Defendant her husband's death certificate after she received the second
9  email. (*See id.* ¶¶ 15–18, 31).  Plaintiff demanded Defendant pay the difference between partial
10 and full coverage ($134,000), but Defendant refused and denied her two appeals. (*See id.*
11 ¶¶ 32–33).

12 Plaintiff sued Defendant in state court on four causes of action: (1) breach of contract; (2)
13 breach of the implied covenant of good faith and fair dealing; (3) negligence; and (4) negligent
14 misrepresentation.  Defendant removed based upon complete preemption under ERISA and has
15 now moved for summary judgment.

16 **II.    LEGAL STANDARDS**

17 A court must grant summary judgment when "the movant shows that there is no genuine
18 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
19 Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson*
20 *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if
21 there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*
22 *id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

23

24      [2]Plaintiff does not indicate whether the entire difference between partial and full
   coverage premiums for previous months were deducted in a lump sum or spread out over several
25 months.

claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

1    At the summary judgment stage, a court's function is not to weigh the evidence and
determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477
U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are
to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely
colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

**III.  ANALYSIS**

**A.    Preemption Under ERISA**

Congress enacted the Employee Retirement Income Security Act ("ERISA") to "protect . . . the interests of participants in employee benefit plans and their beneficiaries," by setting out substantive regulatory requirements for employee benefit plans, and to "provide for appropriate remedies, sanctions, and ready access to the federal courts." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)); *see also Brandner v. Unum Life Ins. Co. of Am.*, 152 F. Supp. 2d 1219, 1223 (D. Nev. 2001).  To this end, ERISA contains expansive preemption provisions that are intended to ensure that employee benefit plan regulation is "exclusively a federal concern." *Id.* (citing *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)).  In determining whether federal law preempts state law, the "Supreme Court has repeatedly held that the question of whether federal law preempts state law is one of congressional intent, and that Congress' purpose is the ultimate touchstone." *Brandner*, 152 F. Supp. 2d at 1223 (citations and internal quotations omitted).

"There are two strands to ERISA's powerful preemptive force." *Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir. 1995).  "First, ERISA section 514(a) expressly preempts all state laws 'insofar as they may now or hereafter relate to any employee benefit plan.'" *Id.* (citing 29 U.S.C. § 1144(a)).  Second, "ERISA section 502(a) contains a comprehensive scheme of civil remedies to enforce ERISA's provisions." *Id.* (citing 29 U.S.C. § 1132(a)).  Under this section, "[a]ny state-law cause of action that duplicates, supplements, or supplants the ERISA

1  civil enforcement remedy conflicts with the clear congressional intent to make the ERISA

2  remedy exclusive and is therefore preempted." *Davila*, 542 U.S. at 209.  Because preemption can

3  occur under either section, the Court must examine both sections. *See Cleghorn*, 408 F.3d at

4  1225 ("A state cause of action that would fall within the scope of [§ 502(a)'s] scheme of

5  remedies is preempted as conflicting with the intended exclusivity of the ERISA remedial

6  scheme, even if those causes of action would not necessarily be preempted by section 514(a)."

7  (quoting *Davila*, 542 U.S. at 214 n.4)).

8  The Court must first determine whether any ERISA plan at all is implicated in the present

9  case.  ERISA defines employee benefit plans as follows:

> (1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).
>
> (2)(A) Except as provided in subparagraph (B), the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>
>     (i) provides retirement income to employees, or
>     (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution.
>
>     . . . .

> (3) The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

29 U.S.C. § 1002(1)–(3). In other words, medical, vacation, disability, scholarship, pension, and other fringe benefit plans are ERISA plans, but salaries, wages, and executive compensation plans are not typically ERISA plans. *See id.*; *Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009).

Defendant argues that the Policy is an ERISA plan and that the state law claims are therefore preempted. Plaintiff alleges that the Policy is exempt from ERISA coverage under 29 U.S.C. § 1321(a)(5). (*See* Compl. ¶ 6). Plaintiff likely means to invoke § 1321(b)(5), which exempts plans from ERISA coverage that have "not at any time after September 2, 1974, provided for employer contributions." 29 U.S.C. § 1321(b)(5). However, the coverages and exemptions listed in § 1321(a) and (b) apply only to Subchapter III (Plan Termination Insurance) of Chapter 18 (ERISA) of Title 29. *See id.* § 1321(a). The Policy here is not one for plan termination insurance, but life insurance, which is covered (or not) under Subchapter I (Protection of Employee Benefit Rights) according to the definitions provided under § 1002. Section 1002 provides that a plan established or maintained by an employer for the purpose of providing benefits in the event of death is a "welfare plan" under § 1002(1) and hence a "plan" under § 1002(3). The general definition of a "plan" under ERISA does not appear to require that an employer necessarily pay any part of the premiums. "An employer . . . can establish an ERISA plan rather easily. Even if an employer does no more than arrange for a 'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees." *Credit Managers Ass'n of S. Cal. v. Kennesaw Life & Accident Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987) (citing 29 C.F.R. § 2510.3-1(j) (1987)). The current Department of Labor regulation is as follows:

> For purposes of Title I of the Act and this chapter, the terms "employee welfare

benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made by an employer or employee organization;

(2) Participation in the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j)(1)–(4) (2011). The Policy here appears to satisfy these four parts of the exemption, and it therefore does not constitute an ERISA plan under the Department of Labor's interpretation of the statute. The Ninth Circuit has found that a group life insurance plan is an ERISA plan where an employer pays a portion of the premiums and agrees to serve as the plan administrator, even if the other prongs of the Department of Labor's interpretation are satisfied. *See Crull v. GEN Ins. Co.*, 58 F.3d 1386, 1390 (9th Cir. 1995). But here, the employer, Microsoft, made no contributions to the premiums, and the Policy makes clear that Prudential is the claims administrator. Defendant admitted at oral argument that the plan does not indicate who the plan administrator is, if that entity is different from the claims administrator. It may be that there simply is no plan administrator apart from the claims administrator, as with a healthcare plan, because an insurance policy is different in nature from a healthcare plan. The former does not require continuous management of care providers, as does a healthcare plan. In any case, Defendant has not satisfied its burden of proof on the point on summary judgment. The Policy is therefore not an ERISA plan under the Department of Labor's regulatory interpretation. Even if the Court does not owe *Chevron* deference to the Department's

1 regulatory interpretation of the statute—because the regulation is here only persuasive authority
2 and has not been applied by the Department in an adjudication of the present case—the facts of
3 this case seem to put it into the "mere advertiser" category under the case law. *See Credit*
4 *Managers Ass'n of S. Cal.*, 809 F.2d at 625 (citing 29 C.F.R. § 2510.3-1(j) (1987)).  For the
5 purposes of the present motion, the Court finds that the Policy is not an ERISA plan.  Because
6 Defendant removed based upon both complete preemption under ERISA and diversity, the
7 Court's ruling in this regard does not raise a jurisdictional defect.

### B. The Merits

Defendant has manually submitted the joint administrative record ("JAR").  The Policy is included in the JAR.  The Policy provides for coverage of spouses or same-sex domestic partners at between 10% and 50% of the amount for which an employee is covered, in 10% increments, but such persons can only be insured up to $100,000 without submitting evidence of insurability. (*See* Schedule of Benefits 5, Bates No. D000256).  New enrollments or increases in coverage that are subject to evidence become effective on the following January 1 or on the date Prudential decides the evidence is satisfactory, whichever is later. (*See id.* 6, Bates No. D000257).  The Policy later reiterates that dependents do not become insured until any evidence requirements are met. (*See id.* 10, Bates No. D000261). The "ERISA Statement" announces (erroneously) that the Policy is an ERISA plan and identifies Prudential as the "Claims Administrator" with "sole discretion to interpret the terms of the [Policy], to make factual findings, and to determine eligibility for benefits." (ERISA Statement 1, Bates No. D000291).

Defendant attacks Plaintiff's Complaint as an ERISA claim and does not address the state law claims.  Therefore, the Court will deny the motion for summary judgment at this time and will await cross motions for summary judgment on the state law claims.  Defendant appeared to admit at the hearing that at a minimum, Plaintiff is entitled to restitution for the overpayment of premiums.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (#18) is DENIED.

IT IS SO ORDERED.

Dated this 31st day of January, 2012.

_____
ROBERT C. JONES
United States District Judge